Case No. 18-1208, VersaTop Support Systems v. Georgia Expo, Inc. Mr. Cooper. If you bring paper, you don't have that problem. I'm sorry? Is it not cooperating? Do we need? Should we call our experts? Okay. All set. Your Honor. May it please the Court. With respect to VersaTop's appeal today, we're asking you to recognize that the test for infringement under Section 1125 of the trademark statute is different than the test for establishing trademark rights under 1127. We're deciding that question under Ninth Circuit law, correct? Correct. And I believe there's no disagreement among the parties as to Ninth Circuit. What case are you relying on to support your position? The Playboy case and the network automation cases are both cases where a court ruled that internet link in Playboy and software and network automation were infringement under 1125 when there was only advertising, advertising alone. What about the statements in Carl Storrs and Free Cycle that seemed to rely on the definition in 1127? Neither of those cases involved situations where both of them are not the same facts as our case, and both of them concern situations where the accused trademark, there wasn't a competitor who copied and or took a trademark owner's trademark, and the question is whether or how they used that trademark in connection with goods or services. I recognize the difference in the facts, but at least the point I'm trying to make is that it seems in the Ninth Circuit there are some conflicting statements as to what definition governs use in commerce, whether it's the one in 1125 or the one in 1127. I think the focus in Carl Storrs and in Free Cycle was on a different character of use because, first of all, in Free Cycle the service is not goods, so it wouldn't even be considering this issue. So I don't see how Free Cycle actually applies to this case at all. And then the Carl Storrs case was a situation where it was a refurbishment case, so you had a trademark used on authentic goods, and the question was simply whether or not there was a problem because those goods were refurbished. It didn't make any difference what the test was. I'm sorry? It didn't make any difference which test you used. The focus there was basically commerce and there was no question about the manner of use. It wasn't a situation like this one and like the ones in Playboy and Network Foundation where it was a defendant looking at the character of a defendant's use of a mark with respect to their goods. It looked like you didn't raise this argument until after the magistrate judge's opinion. Correct? You first asserted the definition from 1127. Am I correct? I don't. In the magistrate judge's decision, you argued that 1125 is the correct definition. That's not my recollection exactly. I think that we had argument as to both 1127 and 125 at the magistrate level. I may have missed that. I think it's been our position throughout that the advertising alone and this concept in 1125 that it's uses in commerce on or in connection, important language difference in 1125 than 1127 which is those uses on or in connection with goods or services. You don't find that language in 1127. If we send this back, what happens? My understanding is there was the original brochure, the original material distributed at the trade show way back. Has anything happened since? To answer your first question, what happens? What our goal or what we would hope and we've asked you to do is either order under the district court know that they should follow that. The damage to our client today exists from those brochures, those knockoff brochures and emails that were sent September and October 2015. Those are still present in the industry and there's an association that people in the industry make with the appellee and those products. We're a small company. We're a one-man operation right now against a large company that has quite a bit of recognition in the industry. If a rule like what the appellee is talking about today stands, that means Walmart could see a small company that's selling a product, take a photograph of their product and their And as long as they never put that trademark on goods and then sold some of the Walmart goods, there would be no liability. Did they distribute those flyers after that initial trade show? The distribution that we're aware of and we had some issues with discovery that I think you're aware of from that record, but we only know what they did the fall of 2015. What we do know is that those brochures, as it occurs in the industry, don't disappear. They stay on somebody's desk. So whatever they distributed, it's our understanding that those brochures are still in existence today, the ones from the fall of 2015. There was no discovery at that stage, is that right? We began discovery but then had some issues because they stopped activity and how Magistrate Judge Stelbrooks chose to view whether we could take additional discovery. Would it be helpful just briefly to talk a little bit of facts to understand what the products are that we're talking about here? Just in a nutshell, aluminum poles that you arrange vertically and horizontally to provide a framework for tracial booths. And the appellee sells those aluminum poles and has for many years, is a major supplier of those. And there's an old way to connect those two poles together, to couple the horizontal and the vertical together. What our client did was invented a new special way to do that. Those brochures took a photograph of a prototype of poles that our client doesn't manufacture, but the couplet. And then the appellee was able to, and those brochures also talk about sales like right away, was able to communicate to the industry that they're selling that product, when in fact they weren't. And that it was a knockoff. You know, it was photographs of our product. But just at least I wanted you to have some background on the nature of products themselves. And noting specifically for you in the record, this is Judge Stelbrooks noting that Risitop's original complaint was precipitated by Georgia Expo's use of photos in Risitop's prototype and trademarks in Georgia Expo emails and flyers. That's at Appendix 783. Mr. Cooper, you mentioned a minute ago when I suggested that you had only raised the definition in 1127 initially, and that you only raised 1125 after the magistrate judge's decision, and you said no, you raised them both. It's my reflection that we were raising both of them before that. I have your opposition to the summary judgment motion in front of me in Appendix 373. You specifically reference 1127. I don't see any reference whatsoever to 1125. I can't tell you anything more than right now in response to that. I recognize that you're referring to that, but maybe on a reply I can just make a point on that. All right. But there's been no suggestion that you waived the issue, right? Yeah, I don't believe there's any suggestion that we waived the issue. And, again, the central points here on the plain language of these two sections is uses in commerce honoring connection with goods or services should not be governed by a use in commerce definition that for public policy reasons is set up for a completely different determination, which is whether or not you've established trade markets and the long-term affixation requirement. Professor McCarthy has long advocated this. We note this for the reasons that I'm describing. And I just would go back to having to reflect on what would be the absurd results with my Walmart example or others if the court decides that uses in commerce for infringement purposes have to meet the more stringent requirement of use in commerce for purposes of establishing rights. Any other questions? Okay, thank you. Let's hear from the other side. Mr. North. Thank you, Your Honor. We believe that the district court, correct? Don't we have to follow the most recent Ninth Circuit authority on this question? I believe the Ninth Circuit has, in Carl Storrs, has resolved this. That's not the most recent decision. The Playboy decision and the network decision come after Carl Storrs. The Playboy decision, Judge Dyke, is in footnote 11 and is dicta on its face. Why is it dicta? Because the in footnote 11, the question was whether there was threshold commerce to even get into the trademark laws. And the court said, yes, there is. And then it made a passing comment about whether the definitional section of 1127, which sets forth the definitions that would cover the 1125, which is infringement for a non-registered mark, which is what we have here, or 1114, which is for a registered mark, whether the definition of use in commerce should be applicable to 1125 or 1114. And in footnote 11, the Ninth Circuit said, well, we have passed this threshold requirement, but by the way, we read the definitional section in a way where it would only be applicable to whether you can get that trademark right in the first place. And why that came up was, as this Court may know, that there was an additional sentence added to that definition in 1127 in 1988. And really where you need to go, and as I was trying to unpack this, so to speak, for today's argument, that in the second case upon which they relied, network automation, what the Ninth Circuit did was it adopted the Second Circuit position on whether these key word searches could, in fact, constitute trademark infringement. It's a one-paragraph discussion which doesn't even talk about whether 1127, as amended, that definition should apply or not. The Ninth Circuit instead said, let's see what the Second Circuit did in RescueCom, and so I'd submit to this Court that actually you need to go to RescueCom, and then you can see what the Second Circuit did there. And what the Second Circuit did there was, for the first time in the Second Circuit, it said, yes, these key word searches, and that's when you can go to Google and say, well, I will sell you the rights to this word, and then if anybody clicks on this word, then you can post your material and have it attached. And so in RescueCom, the Second Circuit said, yes, that is a trademark violation. But in the opinion, what did it say? It said, we are looking to the definition of use in commerce under 1127 as it applies under 1125 and 1114. And there they said, we're going to look, there are two prongs under 1127. It said, we're going to do the services prong, which is different than the product prong here. And what I'd like to point out particularly is really the point that my friends over here are arguing is the appendix. And then they had an appendix of the case in which they reject your position. And in the appendix, it's dicta, but the majority opinion said, we're going to apply 1127's definition of use in commerce to this issue, and the Ninth Circuit incorporated How can the definition in 1127 apply to an infringement context as outlined in 1125 when the definition itself in 1127 begins by saying the term use in commerce means the bona fide use of a mark in the ordinary course of trade? How can an infringing use be a bona fide use? And that's a good question, and let me explain the answer to you. The appendix misinterpreted bona fide in that context. Bona fide can have different meanings in different contexts, and in this context Bona fide infringing use? You can bona fide sometimes means good faith, and I agree that would be contradictory to an infringing use. But also here, bona fide, when they added that sentence in 1988, had nothing to do with a good faith. It had to do whether this was a substantive use in commerce, in which case you would go to the old-time application process, or whether you could go to the new intent to use provision. And so it wasn't talking about good or bad faith. It's something that's talking about. These are all definitions and discussions in 1127 that relate to the requirements to obtain registration, the right to a mark. I disagree with that, Your Honor. Not an infringement. An infringement is defined in 1125. I respectfully disagree with that, Your Honor, because 1125. All right. Tell me where I'm wrong. Yes. If I can grab my binder so I can read the exact words. Yeah. Thank you. They're saying that if there is, in fact, clear infringement that doesn't cross state lines, that that ends it. This distinction which has been drawn is fundamental to trademark registration. What I'm saying is that that definition, that sentence, which was added in 1988, does talk about which path of registration you can go. But it's not talking about bad faith. And to get back to your point, Judge Lynn, if you read through 1127, it says, in the introduction, in the construction of this chapter, which includes 1125 and 1114, this chapter, these definitions shall apply unless the contrary is plainly apparent from the context. Well, isn't it plainly apparent from the context here that a different standard should apply to infringement? I would disagree with that because here the bona fide was not meant to talk about good faith. Well, that, yeah. It makes no sense to say that if you use somebody's trademark in advertising that that's not infringement. How can that make sense? Well, it makes sense because there was no dispute prior to 1988 that under both 1125 and 1114, which are the operational infringement ones, that if you had a product, you would not be, you had to prove that that trademark was on the product or on a container in that. That's not true. I mean, you had decisions on the Second Circuit and the Ninth Circuit, well, at least maybe the Second Circuit, that seemed to say that. But there wasn't a consensus about that. It wasn't an issue which was much addressed. And I think that you may make a good argument that the decision of the Second Circuit in the appendix is kind of convoluted. But why should you just construe the statute at the outset as not using that definition from 1127 for infringement purposes because infringement sits clearly in a different context? Because, again, 1125 and 1114 are within that specific subchapter. And so it applies unless expressly there is a reason not to. And arguably, Congress was not artful in making that change. It doesn't say unless expressly, unless it's plainly apparent from the context. And the context is crystal clear. I mean, 1125 is directly relating to infringement. And 1127 is talking about what you need to do in order to register your mark in commerce, whether it's on a product or whether it's used on a service. The context is we couldn't be more clear. And, in fact, I think it would make no sense to interpret this otherwise because you could have a situation like, for example, let's suppose I decide I'm going to sell chocolate bars, so I'm going to advertise Hershey's chocolate bars, and I'm going to show a picture of a Hershey's chocolate bar in my ad. And then when those orders are filled, I'm going to send generic chocolate bars. It doesn't say anything about Hershey. It's just a generic chocolate bar. No infringement, right? Because I'm not putting the Hershey's mark on any product sold in commerce. I'm not using that mark in commerce pursuant to 1127. But I'm certainly writing on Hershey's coattails. Well, I think there are false advertising and other remedies for that, but I think the Second Circuit even recognized that. Why doesn't 1125 cover that? Well, the question is in interpreting 1125, whether you when it says uses in commerce in 1125 or use in commerce in 1114, whether you need to look back to the definitions of 1127, which cover a variety of different things, including what commerce means, and then apply that or not. And before 1988, it was clear that under 1125, if it was a product, you did need that label. And the question is when they added... It was clear. Clear from what? From the words definition, use in commerce, and those same words being used in 1125 and 1114, which are within the same subchapter. And so before then, in the Second Circuit, in its discussion, the appendix said before that sentence was added, when we were changing the rules regarding the registration, it was clear that you had to mark in order to have... I don't see that the Ninth Circuit has necessarily agreed with that. I think the... I would agree with you, Judge Dyke, that the Ninth Circuit has not dealt with that question head on at this point. I think this Court in South Coe, when it looked at the same language, came up with the same conclusion that, in fact, 1127, use in commerce, should apply. And in that case, there was a catalog, internet catalog, and some basic pricing. And this Court, and it was applying from the District Court of the Eastern District of Virginia. So I don't mean to be misleading that it's Ninth Circuit. But this Court, just looking at the statute and not even applying the circuit law, said, yes, that is use in commerce in the definition, and it should be used in the context of 1125. And because it is not, there's nothing to the contrary, it applied it and said, here, there is no labeling or attaching just simply from having that advertising out there. And we cited that at page 23, note 4 of our brief on that. The other thing I'd like to say about that, Your Honors, and, Judge Lynn, to distinguish this from the hypothetical that you put out there, in this case, there wasn't an advertisement even. What it was, we had two flyers at a trade show in October of 2000. Well, what is a flyer if not an advertisement? Well, the difference, and I think here, is that the flyer said, for instance, in development, expected in 2016. The second one said, stay tuned for more information. And so, it was clear from the face of these that there wasn't even a product at that point. There was no pricing. There was no offering. There was no nothing. It was at. The flyer says, call us for prices. It doesn't say that. It says, contact us if you're interested. It says something or other. I don't know the exact words. If you're interested. For more information, contact us. That is correct. But there was, on the face of it, it was very clear that there was no. Is that an advertisement? I think to advertise something for sale, then there has to be more information. There actually has to be a product that you're selling. I can't say, well, I might be having a new chocolate bar in a year, and that might be of interest to you, and that that would somehow invoke a trademark problem. The record is undeveloped as to why that took place, because they never took our depositions on that point. But I think the bottom line is here, under Southco, as applying the statutory language, just having advertising material untethered to a specific product, this Court, applying from a district court elsewhere, said, no, this language does not get you to a violation given those definitions. That was non-presidential opinion, correct? Southco? Your Honor is correct that it was not binding. I only point out that, at least in one context, this Court has come out the same way, and I'd also point out that not that we're arguing waiver, but before the Court, at Appendix 89 and 90, where Magistrate Judge Gelderts is addressing their arguments, they were going down, 1127 applies to 1115, straightforward, but they were arguing the services prong. And they only flip-flopped on that when they lost before the magistrate judge. And at Appendix 90, in his order or findings, Magistrate Judge Gelderts even said, in its reply, Verasitop does not refute Georgia Expo's application of this definition and instead focuses on other things. So it was going full bore on 1127 applies to 1125, and then changed up when the magistrate didn't agree. So in candor, I agree. But there's no waiver issue here. That was not raised, correct? We are not arguing waiver, just that it is an acknowledgment that the argument that it is applicable is not something that's specious. Okay. Thank you, Mr. North. Mr. Pinker, you have three minutes of rebuttal on this issue. Thank you. Your Honors, Mr. North is arguing non-controlling precedent, spent some time on the Second Circuit. And the Southcote case, the key thing in the Southcote case, also Eastern District of Pennsylvania, actually it was, a Third Circuit case, was about commerce, not the defendant's character of use of a mark, but a foreign defendant who'd never done anything in the U.S., and whether the commerce part of use is in-commerce applied, and whether it was a type of commerce that Congress could regulate. So it's a completely different case on that alone compared to, again, back to the point, the character of the use of a defendant who used somebody else's mark on their goods. Bonafide use under 1127, as Judge Blinn noted, is just another example of, I think, the concept of fitting a round peg in a square hole here to apply the establishment-based affixation requirement to the infringement use. The accused brochure does at the, one of the accused brochures with no date on it, notes at the end, for more information, call the sales department. That's an advertisement of the two brochures we're talking about in the case. Versatop seeks validation in the industry. Judge Blinn, when you asked, where does this case go if you chose to rule in our favor? And the way that that could happen, because of what's happened to Versatop and what's gone on, people are watching this and seeing how someone can use by having an injunction that, at a minimum, Georgia Expo can't do it again. And the rule that the court would set in following what we're asking you to do would set a rule that would prevent the other, what I call absurd results, if I had my Walmart example or your Chocolate Bar example. And we did rely on 1125 in our brief, as you noted. I just want to make clear, but, again, we don't have a waiver machine. Thank you. Thank you.